# AFFIDAVIT

I, **Ellen Duffy**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.   I am a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice. As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Sections 1201 and 1512. I was hired by the FBI as a Special Agent in January 2018. I attended the FBI's training academy in Quantico, Virginia, where I received instruction regarding a variety of investigations, including drug trafficking and violent gang offenses. I graduated from the FBI training academy as a Special Agent in May 2018. I am currently assigned to the Pittsburgh Division, sitting in Martinsburg, West Virginia, and I serve on the Eastern Panhandle Drug & Violent Crime Task Force. I investigate a wide variety of criminal offenses, including murder, kidnapping, and drug trafficking.

2.   Prior to my employment with the FBI, I was employed with the University of Florida Police Department (UFPD) for approximately seven years. I served as a Patrol Officer, Detective, and Detective Sergeant. Prior to my employment with UFPD, I was employed as a Special Agent with the United States Department of Education, Office of Inspector General for approximately two years.

3.   I obtained the information contained in this affidavit from my personal participation in the investigation, my training and experience, and from other law enforcement officers and witnesses. This affidavit is intended to show probable cause for the associated complaint and does not purport to set forth all my knowledge concerning the underlying

1

investigation. I do not request that this Court rely upon any facts not set forth herein in reviewing this affidavit and accompanying complaint.

4. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 2 and 1512(a)(1)(C), which make it a crime to aid and abet tampering with a witness causing death, have been committed by April Braner.

## PROBABLE CAUSE

5. On March 18, 2020, at approximately 0734 hours, deputies from the Jefferson County Sheriff's Office (JCSO) were dispatched to the area of Smith Road and Ward Clipp Road in Jefferson County, Northern District of West Virginia, for a report of a human body on fire. Upon arrival, Sergeant Steven Holz of JCSO observed a deceased, partially burnt male lying on the ground approximately 40 feet from the roadway. There was a large pool of blood in the roadway, with a trail of blood leading to the body. The male was identified as J.R. of Taneytown, Maryland through FBI fingerprint records.

6. On March 18, 2020, Sgt. Holz contacted J.R.'s widow. J.R.'s widow advised that when she went to sleep on March 17, 2020, J.R. was home and awake. When J.R.'s widow woke up on March 18, 2020, she reviewed data from a family tracking application on her cellular phone. J.R.'s widow observed that J.R. left their residence after she went to sleep and his last known location was in Westminster, Maryland. J.R.'s widow advised that their black 2019 Ford Fusion bearing MD registration 7EB7392 was missing and was likely driven by J.R.

7.     Sgt. Holz interviewed J.R.'s mother. Starting at 0041 hours on March 18, 2020, J.R. sent his mother a series of text messages in which J.R. said he was in a bad situation and needed help. The messages included, "Guy is gonna shoot me if I don't pay 40 dollars;" "I'm scared;" and, "Guess I die then."

8.     There is a stationary License Plate Reader (LPR) on Route 340 North in Jefferson County, West Virginia. This LPR records license plates of vehicles traveling in both lanes in each direction. The LPR records showed that on March 18, 2020 at 4:05:31 a.m., J.R.'s vehicle, bearing Maryland license plate 7EB7392, traveled southbound into Jefferson County in the left lane. The LPR records revealed that two seconds earlier, a vehicle bearing Maryland license plate 9BY0804 traveled in the same lane and the same direction. A check of this license plate revealed that it was assigned to a 2015 Chevrolet sedan.

9.     Through license plate research and an interview, Sgt. Holz determined that at the time of this incident, the Chevrolet sedan bearing Maryland license plate 9BY0804 was being used by juvenile L.M., who resided with his parents and older brother, Monroe Merrell ("M. Merrell"), in Westminster, Maryland.

10.    On March 20, 2020, Sgt. Holz went to the Merrell residence. The Chevrolet Malibu bearing MD license plate 9BY0804 was parked in the driveway. Sgt. Holz contacted M. Merrell outside of the residence and identified himself as being from JCSO in West Virginia. Sgt. Holz noted that M. Merrell appeared extremely nervous and an artery in his neck began to pulse. Sgt. Holz saw a small cut on the top of M. Merrell's right hand near his thumb and index finger. M. Merrell's parents came outside and advised they wished to contact an attorney.

11.    On March 19, 2020, an autopsy of J.R. was conducted at the Office of the Chief Medical Examiner in Charleston, West Virginia. Your affiant reviewed the autopsy report.

The examiner's opinion regarding the cause of death is "multiple sharp force injuries with other significant findings: multiple blunt force injuries." The manner of death is listed as homicide.

12. Through a review of cellular telephone information, Facebook records, database records, and Maryland Motor Vehicle Administration (MVA) records, Sgt. Holz identified D.T. of Taneytown, Maryland as being an associate of M. Merrell. Your affiant was later advised by several witnesses that D.T. was dating M. Merrell around the time of J.R.'s murder. Your affiant learned through interviews and Facebook records that H.G. was an acquaintance of J.R., and H.G. was a live-in babysitter for David Sanford ("Sanford"), who was a close friend of M. Merrell.

13. Your affiant interviewed a cooperating individual (CI), CI-1. CI-1's identity is known to your affiant. CI-1 provided information that your affiant confirmed through independent investigation. CI-1 advised that J.R.'s kidnapping and homicide started in an apartment shared by H.G., Sanford, and Sanford's girlfriend, Emily Day ("Day"), at 301 East Main Street, Westminster, Maryland. CI-1 witnessed J.R. arguing with M. Merrell and Sanford inside the apartment. J.R. attempted to run from the apartment, but M. Merrell restrained J.R. and told Sanford to get a knife. CI-1 saw Sanford stab J.R. twice in the abdomen with a small knife. CI-1 saw M. Merrell, Sanford, and other individuals who were present beat and kick J.R. CI-1 saw M. Merrell and other individuals present bind J.R.'s hands and feet using cuttings from a sheet. CI-1 advised that J.R. was alive when J.R. was bound.

14. CI-1 advised that shortly thereafter, J.R. was loaded into his own vehicle and driven to West Virginia. M. Merrell drove J.R.'s vehicle and additional individuals followed in L.M.'s vehicle. When they reached the location where J.R.'s body was later discovered, CI-1 observed flames and smoke from a fire being set. Shortly thereafter, CI-1 heard M. Merrell say he

4

"iced" someone, which CI-1 thought meant "killed" someone. CI-1 heard M. Merrell say that J.R. had been trying to get out of the vehicle during the ride to West Virginia. CI-1 also heard M. Merrell say M. Merrell had stabbed J.R. CI-1 advised that J.R.'s vehicle was abandoned and set on fire in another location.

15. On March 21, 2020, the Frederick County (Maryland) Sheriff's Office recovered the burned remains of J.R.'s Ford Fusion in a farm field. The vehicle was identified by partial vehicle identification number.

16. Your affiant interviewed a cooperating individual, CI-2. CI-2's identity is known to your affiant. CI-2 provided information that your affiant confirmed through independent investigation. CI-2 also witnessed J.R. in an argument with M. Merrell and Sanford, at the apartment occupied by Sanford, Day, and H.G. CI-2 saw J.R. try to flee and saw M. Merrell restrain J.R. CI-2 heard M. Merrell tell Sanford to stab J.R. and saw Sanford stab J.R. in the stomach with a small knife. CI-2 witnessed M. Merrell, Sanford, and other individuals who were present kick and hit J.R. all over his body, including his head. CI-2 observed J.R. being bound with a cut-up sheet. CI-2 was amongst the individuals who then caravanned into West Virginia. CI-2 reported seeing fires being set in the locations where J.R.'s body was left and where J.R.'s vehicle was abandoned.

17. CI-1 and CI-2 advised that D.T. and a female babysitter (known to your affiant to be H.G.) were present at the apartment at the time that J.R. was assaulted, stabbed, and bound. CI-2 advised that H.G. was visibly upset. CI-2 heard M. Merrell say that H.G. was friends with J.R. and heard M. Merrell say to Sanford that someone was going to tell.

18. On April 6, 2020, Sgt. Holz interviewed H.G. at the apartment at 301 East Main Street, Westminster, Maryland (this interview occurred prior to the interviews of CI-1 and

CI-2). H.G. advised that J.R. was at this address late on March 17, 2020. H.G. advised that she and J.R. were the only two people in the residence at the time and that J.R. left on his own. H.G. advised that she lived at this residence and babysat the children of Day and Sanford. Day and Sanford were in the apartment when Sgt. Holz interviewed H.G. just outside the residence.

19. On April 9, 2020, Sgt. Holz obtained arrest warrants for M. Merrell and Sanford for J.R.'s kidnapping and murder. A search warrant was obtained for Sanford's apartment. Your affiant was present at the execution of the search warrant and saw that new carpet had been laid in the living room and halfway up the stairs. According to CI-1, J.R. was stabbed while he was restrained in the landing area near the base of the stairs. CI-2 saw blood on the floor in that area after J.R. was stabbed.

20. On April 9, 2020, the Maryland State Police received information that H.G. and D.T. had been taken to West Virginia on April 6, 2020, and possibly killed. Your affiant and other investigators reviewed social media and telephone records and could find no activity by D.T. or H.G. after April 6, 2020. D.T. and H.G.'s family members confirmed that D.T. and H.G. were missing.

21. Your affiant interviewed a cooperating individual, CI-3. CI-3's identity is known to your affiant. CI-3 provided information that your affiant confirmed through independent investigation. CI-3 advised that Sanford, Day, M. Merrell, and D.T. were friends with an individual identified as Jeffrey Smith ("Smith"). CI-3 advised that D.T. had been dating M. Merrell and that D.T. had been living with Smith in Westminster, Maryland just prior to her disappearance. CI-3 advised that on the evening of April 6, 2020, D.T. and Smith were not at their residence in Westminster, Maryland. CI-3 never saw D.T. at this residence (or anywhere else) after April 6, 2020.

22. On April 15, 2020, M. Merrell was apprehended in Virginia on his outstanding warrant. M. Merrell was in the company of April Braner ("Braner") of Falling Waters, within the Northern District of West Virginia. Your affiant determined that Braner resided at 373 Burnside Drive, Falling Waters, West Virginia. Also present in Virginia with Braner and M. Merrell was Norman Bradford ("Bradford"). Your affiant learned through several witnesses that Bradford lived in a recreational vehicle parked on Braner's property in West Virginia.

23. Your affiant interviewed a cooperating individual, CI-4. CI-4's identity is known to your affiant. CI-4 provided information that your affiant confirmed through independent investigation. CI-4 was familiar with the property of 352 Burnside Drive, Falling Waters, West Virginia, which is across the street from Braner's residence. According to CI-4, there was a trailer on the property located at 352 Burnside Drive that was referred to as "the clubhouse" and was used for parties by a local motorcycle gang.

24. CI-4 told your affiant that Braner had recently begun dating an individual CI-4 identified through a photograph as M. Merrell. At the time of the below-described incidents, M. Merrell had been residing on Braner's property for approximately two weeks.

25. Late on the afternoon of April 6, 2020, Braner told CI-4 that Day and Sanford were bringing two females to West Virginia to be killed later that day. Braner told CI-4 that the females who were going to be killed had witnessed a previous crime committed by M. Merrell. Braner told CI-4 that the plan involved putting drugs in the drinks of D.T. and H.G. and killing them away from the clubhouse.

26. CI-4 told your affiant that Braner purchased drugs that were to be put in the drinks of H.G. and D.T. CI-4 told your affiant the name of the individual from whom Braner

7

purchased the drugs. Your affiant later interviewed that individual, who advised that Braner purchased liquid methadone.

27. According to CI-4, at approximately 8:00 p.m. on April 6, 2020, the following individuals arrived at Braner's property: Day, Sandford, their two children, and two additional females. CI-4 provided descriptions of D.T. and H.G. and then identified them from photographs as being the two additional females. CI-4 told your affiant that an individual known to her as "Jeff" was also present. Your affiant showed CI-4 a photograph of Smith and CI-4 identified him as the individual known as "Jeff."

28. CI-4 told your affiant that on this evening (April 6, 2020), M. Merrell, Braner, Sanford, Day, Smith, D.T., and H.G. were together in the clubhouse. CI-4 witnessed H.G. place a can of beer that H.G. had been drinking on the bar in the clubhouse and state that she (H.G.) could not drink it because it tasted funny. When CI-4 left the clubhouse for the evening, H.G. and D.T. were alive. On April 7, 2020, Braner told CI-4 that during the previous night, D.T. was suffocated with a bag and H.G. was taken for a ride away from the clubhouse. Braner told CI-4 that the females had been burned.

29. Your affiant interviewed a cooperating individual, CI-5. CI-5's identity is known to your affiant. CI-5 provided information that your affiant confirmed through independent investigation. CI-5 told your affiant that on April 6, 2020, after H.G. was interviewed by Sgt. Holz, a plan was made for the following individuals to travel to Braner's clubhouse that evening: Sanford, Day, their children, H.G., Smith and D.T. This group arrived at Braner's clubhouse in the evening hours while M. Merrell, Braner, and Norman Bradford were already present on the property.

30. During the evening, CI-5 heard H.G. say that M. Merrell had mixed liquor into her beer, and she did not like the taste. CI-5 heard H.G. ask for a new beer, but M. Merrell

8

told H.G. that she had to finish her beer. After that, M. Merrell privately told CI-4 that D.T. and H.G. were "loose ends" and that something had been put in their drinks to knock them out. D.T. passed out in a chair in the clubhouse. CI-5 heard Braner make comments to the effect that Braner did not understand how H.G. was still up because what they gave H.G. was strong. After D.T. passed out, CI-5 observed M. Merrell, Smith, and H.G. leave to go for a ride.

31. According to CI-5, Braner and Sanford were upset that M. Merrell had left D.T. in the clubhouse. Braner made a comment that M. Merrell was being "messy," which was how he had erred the first time. Sanford then asked Braner for a bag. Braner gave Sanford a bag, but he told her it would not work because he needed a bag without holes. Braner then gave Sanford a black trash bag.

32. CI-5 briefly left the main room of the clubhouse. When CI-5 returned, CI-5 saw D.T. lying face-down on the floor, with Sanford standing over her. The black trash bag was over D.T.'s head and twisted tightly around D.T.'s neck. D.T. was not moving. Sanford realized D.T. was still breathing and CI-5 witnessed Sanford tighten the bag around D.T.'s neck. Shortly thereafter, CI-5 heard Sanford say it was done.

33. According to CI-5, Smith and M. Merrell returned shortly thereafter. CI-5 saw blood on M. Merrell's hands, arms, and shirt. M. Merrell and Smith were talking about Bradford, saying Bradford had been right behind them and they did not know where he went. CI-5 then saw Bradford arrive back at the clubhouse.

34. CI-5 heard M. Merrell describe what happened to H.G. M. Merrell said he convinced H.G. to get out of the car by telling her they would have sex. While M. Merrell was having sex with H.G., Smith walked up and shot H.G. in the head. H.G. said something like, "Ow,"

after the first shot and because H.G. was still moving Smith shot her again. H.G. did not move anymore. They left H.G.'s body in the field and returned to the clubhouse.

35. During this investigation, your affiant conducted two voluntary interviews of Smith. Sanford told Smith about the J.R. homicide. Sandford told Smith that the incident started over a drug deal, that Sanford had stabbed J.R., and that M. Merrell had slit J.R.'s throat. Smith advised that Sanford removed blood-stained carpet from the apartment after the stabbing. Smith assisted Sanford when Sanford purchased and laid new carpet in the apartment.

36. Smith told your affiant that D.T. had been living with Smith in early April 2020. Smith advised that on April 6, 2020, Sanford came to his house and told him the police had talked to H.G. Sanford and Smith talked to M. Merrell via phone and a plan was made for everyone to travel to West Virginia that evening. M. Merrell told Smith to tell D.T. that she and M. Merrell were going to flee the country because of the J.R. case.

37. According to Smith, on the evening of April 6, 2020, Smith drove the following individuals from Maryland to Braner's property in West Virginia: Sanford, Day, their two children, D.T., and H.G. When Smith arrived, M. Merrell told Smith that D.T. and H.G. were going to be drugged, and when they passed out, they would "handle it" from there.

38. According to Smith, D.T. eventually passed out, but H.G. did not. H.G., M. Merrell, Bradford, and Smith left the clubhouse in two vehicles (Smith's Mountaineer and Bradford's Durango) to go for a "blunt ride." They drove to a field within the Northern District of West Virginia, where M. Merrell and H.G. exited the Mountaineer. M. Merrell had told Smith that M. Merrell was going to start having sex with H.G. and then Smith was supposed to shoot H.G.

39. According to Smith, in the field, M. Merrell and H.G. began to have sex. Smith walked up with a silver revolver in his hand but could not get himself to pull the trigger.

10

Smith denied being the shooter but advised that he witnessed H.G. being shot in the head three times. According to Smith, after the first shot, H.G. said "Ow." Smith advised that the revolver used to shoot H.G. was one Smith had recently owned. Smith said he had sold the revolver to Bradford a few days before the shooting.

40. On June 9, 2020, your affiant interviewed Norman Bradford. Bradford advised that M. Merrell came to live at Braner's property in late March 2020. While there, M. Merrell told Bradford that J.R. tried to rob M. Merrell and things went bad. M. Merrell told Bradford he wanted to get rid of D.T. and H.G. because they were "loose ends." M. Merrell told Bradford he planned to drug D.T. and H.G.

41. During the evening of April 6, 2020, Bradford went back and forth between the clubhouse, his camper, and other locations. While in the clubhouse, Bradford observed that D.T. and H.G. appeared heavily intoxicated and Bradford heard Braner telling M. Merrell to take care of his business.

42. According to Bradford, late that night, Bradford left the clubhouse with M. Merrell, Smith, and H.G., in two vehicles (M. Merrell and H.G. in Smith's Mountaineer, and Bradford and Smith in Bradford's Durango). Smith had a gun with him. They drove into a field. Smith got out of the Durango and walked towards the Mountaineer. Bradford could not see what was happening at that time, but Smith later told Bradford that M. Merrell was having sex with H.G. Bradford heard three gunshots. Smith came back to Bradford's vehicle and said H.G. had moaned something the first time Smith shot her. They all left the field, leaving H.G.'s body behind in the field.

43. According to Bradford, a fire was lit in the fire pit behind Braner's clubhouse shortly after D.T. and H.G. were killed. Bradford saw what appeared to be a human

11

skull in the fire pit. Smith told your affiant that on the morning of April 7, 2020, he saw a female's body being burned in the fire pit. CI-4 told your affiant that on that morning, Bradford was standing by the fire pit. A large fire was burning, emitting an unusual, unpleasant smell.

44. Bradford told your affiant that H.G.'s body was retrieved from the field on the night of April 7, 2020 or April 8, 2020. According to Bradford, M. Merrell kept the fire behind the clubhouse burning both before and after H.G.'s body was retrieved, and until the material in the pit was completely burned. Bradford saw M. Merrell stepping on debris in the fire pit. According to Bradford, M. Merrell shoveled ashes from the fire pit into several plastic trash bags. Bradford advised that the bags of ashes were transported to the Potomac River in Bradford's Durango and dumped into the river.

45. On April 7, 2020, at 2:56 a.m., a 911 caller reported to the Berkeley County Central Dispatch having just heard three gunshots and having seen two vehicles in a field at an identified location in Hedgesville, West Virginia. On June 9, 2020, your affiant transported Bradford to the vicinity of the identified location. Bradford identified an area within a field there as the location where H.G. was killed.

46. Search warrants were obtained for Bradford's cellular telephone and for the Google account associated with his phone. Your affiant reviewed location data from Bradford's Google account. Bradford's location was registered at April 7, 2020 at 2:43 a.m. and again at 3:01 a.m. At both times, Bradford's location data placed Bradford within one mile of the field where H.G. was shot. Bradford's Google location data placed him within approximately one-half mile of the field again on April 8, 2020 between 12:16 and 12:22 a.m. On April 9, 2020 at 11:22 a.m. and 11:28 a.m., Bradford's Google location data placed him on the shoreline of the Potomac River near Braner's property in Falling Waters, West Virginia.

47. On April 16, 2020, your affiant executed a search warrant at 352 Burnside Drive, Falling Waters, West Virginia (the property where the motorcycle clubhouse was located). During the execution of the search warrant, several small pieces of possible bone were collected from the fire pit. The FBI laboratory has since determined that six of the fragments are thermally altered bone.

48. Your affiant reviewed recorded telephone calls from the Virginia Beach Correctional Center, during which M. Merrell spoke to Smith and Bradford. Smith and Bradford professed their loyalty to M. Merrell. M. Merrell, Bradford, and Smith discussed news reports which indicated that a cooperating witness was providing information about the J.R. homicide to law enforcement. During the calls, they used coded language about a "green light" for a plan to "show...the ropes" to someone. Both Smith and Bradford later told your affiant that these coded conversations pertained to a plan, which had been discussed prior to M. Merrell's arrest, to kill another witness to the J.R. kidnapping and homicide.

49. If D.T. and H.G. had not been killed, your affiant would have interviewed them regarding the interstate kidnapping and homicide of J.R.

## CONCLUSION

50. Based on the facts set forth herein, there is probable cause to believe that violations of the Title 18 U.S.C. §§ 2 and 1512(a)(1)(C) have been committed by April Braner.

The information in this affidavit is true to the best of my knowledge and belief.

FURTHER AFFIANT SAYETH NAUGHT

*Ellen Duffy*
Ellen D. Duffy
Special Agent, FBI

Subscribed and sworn to before me this 21st day of October 2020.

*Robert W. Trumble*
Hon. Robert W. Trumble
United States Magistrate Judge